# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cr-00009 |
| | ) | Judge Aleta A. Trauger |
| | ) | |
| ELISANDRO ARANDA | ) | |

## MEMORANDUM AND ORDER

Pending before the court is a Motion to Suppress (Docket No. 20) filed by the defendant, Elisandro Aranda, to which the government has filed a Response in opposition (Docket No. 29), and Aranda has filed a Reply (Docket No. 32). Following the evidentiary hearing at which only Tennessee State Trooper Rhett Campbell testified, the parties filed additional briefing (Docket Nos. 37–39.) For the reasons discussed herein, the motion will be denied.

## FINDINGS OF FACT

On the morning of June 7, 2017, Trooper Campbell was parked in the median of Interstate 40 in Hickman County, about 50 miles west of Nashville, when he observed two cars commit traffic violations and pulled both cars over. As might be predicted, this is a tricky maneuver and was not executed in a simple way by Trooper Campbell, but the details of that process are not relevant to the court's inquiry on this motion to suppress. All three cars ended up on the shoulder of the interstate, with the trooper's car at the back, the SUV that he had pulled over for following another vehicle too closely in front of the trooper's car, and the defendant's Saturn 4-door sedan at the front.

While Trooper Campbell was talking with the occupants of the SUV, he noticed, out of the corner of his eye, the back passenger-side door of the Saturn open and close quickly. Because he had only noticed the driver in the car and no other occupants, he became alarmed for

1

his safety and immediately went up to that vehicle. The window was up, so in order to speak to the occupant in the back seat and to provide some measure of protection in case that person had a weapon, he opened the rear passenger door, using the frame of the car as a shield. There was a woman passenger in the back seat, and he instructed her and the driver to stay in the vehicle and not move around. While talking to the passenger, later identified as Cordelia Alvarado, he noticed in the webbed pocket behind the front passenger seat a medicine bottle. He asked Ms. Alvarado if she would mind handing the bottle to him, which she did. The bottle, tinted a translucent blue, had a prescription label for Tramadol, issued to David Gunnells and expiring on August 24, 2012. The occupants of the Saturn confirmed that neither of them was David Gunnells, and Ms. Alvarado stated that he was a friend of theirs and had left the bottle in the car a few days before. Trooper Campbell could tell that there were pills in the bottle, but he did not open the pill bottle at that time. He held onto the bottle as he went back to the SUV and concluded that traffic stop with a warning to the driver.

Trooper Campbell returned to the Saturn vehicle and explained to the defendant, who was the driver of the Saturn, and Ms. Alvarado that he had pulled them over for swerving onto the "fog line" once and over the "fog line" twice.[1] The defendant stated that he had not realized that he had done that. Trooper Campbell secured the driver's license of the defendant and name, social security number, and date of birth from Ms. Alvarado, who stated that her license was in the trunk. Trooper Campbell testified that he noticed that the defendant had bloodshot eyes, his eyelids were drooping, and he appeared tired and said he was. He also noticed that both

---

[1] "Fog line," in this instance, was the painted line on the left side of the left lane of traffic, which separates the travel lane from the median.

occupants were breathing heavily and that their hands were shaking. Campbell ordered Aranda out of his vehicle for questioning.

Trooper Campbell testified that, at that point, he had probable cause to search the car, based upon the medication bottle and the nervous reactions of the defendant and Ms. Alvarado. He called for backup because there was "more going on" and returned to question the defendant and Ms. Alvarado. The defendant was standing on the side of the roadway, and Ms. Alvarado was still in the car. When asked where they were going, the defendant stated that they were going to Georgia to see Ms. Alvarado's son, who was going to be deployed with the military. Aranda did not know where in Georgia they were going or in which branch of the military Alvarado's son served. Ms. Alvarado told the trooper that they were going to South Carolina to stay with her sister for a week and then to Georgia to see her son off with the military. The defendant stated that he bought the car in Mexico, and Ms. Alvarado stated that he bought the car from a cousin in Texas. Taking their stories as conflicting, Campbell requested the vehicle's documentation and contacted the Blue Lightning Operations Center ("BLOC"), a subunit of the United States Customs branch of the Department of Homeland Security, for computer checks on both passengers and the vehicle. Trooper Campbell learned that the defendant had last crossed the Mexico border in the same car a day or two before. When asked about his last border crossing, the defendant told Trooper Campbell that it was some 3 months earlier.

The defendant and Ms. Alvarado initially consented to the trooper's search of the car. However, before the search began, the defendant retracted his consent. Wanting consent but not feeling he needed it because he had probable cause, Trooper Campbell proceeded to search the car. He found a glass pipe used for the smoking of marijuana in the glove compartment but nothing else suspicious until he saw, under the car, a "pop rivet." His experience doing drug

3

interdiction for many years suggested to him that the pop rivet might conceal a hidden compartment. In order to search the compartment adequately and in a safe place, the car was moved to a truck stop at the next exit. The defendant and Ms. Alvarado were transported there in the back of Trooper Campbell's car. When the car was placed on a lift, additional searching revealed a hidden compartment behind a wheel casing that contained approximately 5 kilograms of cocaine. Aranda was charged under 21 U.S. C. § 841(a)(1) with possession with intent to distribute. On October 27, 2017, he moved to suppress the cocaine. (Docket No. 20.)

## LEGAL STANDARD

The Fourth Amendment protects an individual's right to be free of unreasonable searches and seizures, including those conducted without a warrant based upon probable cause. U.S. Const. Amend. IV. There are exceptions to the warrant requirement, including the automobile exception. *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) ("Under the automobile exception to the warrant requirement, an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity."). Under the exclusionary rule, prosecutors are barred from introducing evidence obtained in violation of the Fourth Amendment. *Davis v. United States*, 131 S. Ct. 2419, 2423 (2011).

## ANALYSIS

Aranda advances several arguments for suppression: 1) Campbell's initial stop of Aranda's vehicle was improper; 2) Campbell's opening the rear passenger door constituted a constitutionally impermissible search; 3) Campbell did not have probable cause to search the car once Aranda revoked consent; and 4) moving Aranda's vehicle to the gas station was an improper seizure. The court will address each argument in turn.

4

I.  *The initial stop*

Aranda first argues that Campbell's reason for pulling him over—crossing the fog line—did not sufficiently justify the stop. Aranda contends that Campbell did not have reason to believe that Aranda crossed the fog line, rendering the stop pretextual. He further contends that, even if he did cross the fog line, his few, brief crossings did not constitute a violation of Tennessee law. "A police officer may stop a motorist when he possesses probable cause of a civil infraction or has reasonable suspicion of criminal activity."[2] *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016). Tenn. Code. Ann. § 55-8-123(1) mandates that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety." The Tennessee Supreme Court has held that crossing the fog line unnecessarily is a violation of § 55-8-123(1). *See State v. Smith*, 484 S.W.3d 393, 410–11 (Tenn. 2016) ("[W]hen an officer observes a motorist crossing a clearly marked fog line, the totality of the circumstances may provide a reasonable suspicion sufficient to initiate a traffic stop to investigate the possible violation of Section 123(1). If the officer observes circumstances rendering it practicable for the motorist to remain in her lane of travel, that observation will weigh in favor of reasonable suspicion."). In *Smith*, the Tennessee Supreme Court affirmed a finding of reasonable suspicion where an officer pulled over a driver for crossing the fog line twice and driving onto it once.

---

[2] Aranda also argues that, pursuant to *Rodriguez v. U.S.*, 135 S. Ct. 1609 (2015), Campbell unconstitutionally delayed Aranda's traffic stop for three minutes by conducting a pretextual stop of the other vehicle that Campbell pulled over simultaneously. But there is no evidence supporting that stop as pretextual. Campbell pulled over the other vehicle for following too closely, a traffic violation in Tennessee. *See* Tenn. Code. Ann. § 55-8-124. In his interaction with the other vehicle, Campbell did not "detour[]" from handling the traffic violation to investigate unrelated criminal activity. *See Rodriguez*, 135 S. Ct. at 1616. Because Campbell's stop of the other vehicle was not pretextual, Aranda's stop was not unconstitutionally delayed under *Rodriguez*. *See id.* at 1616.

5

The court finds credible Officer Campbell's testimony that he observed Aranda crossing the fog line twice and driving onto it once. There was no evidence that it was impracticable for Aranda to stay in his lane of traffic. There was neither inclement weather nor hazardous objects in his path that necessitated crossing the fog line. The initial stop was therefore proper.

II. *The opening of the rear passenger door*

Aranda next argues that Campbell's opening of the rear passenger door was a constitutional search lacking probable cause. Absent Campbell's opening of the car door, Aranda contends, the prescription pill bottle would not have been discovered, rendering the evidence recovered in the later search fruit of the poisonous tree. The court will assume, for purposes of analyzing this argument, that the opening of the door was a search for Fourth Amendment purposes.

Under the inevitable discovery doctrine, evidence discovered illegally may nevertheless be admissible if it inevitably would have been discovered by proper means. *See Nix v. Williams*, 467 U.S. 431 (1984). "The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *See United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995) (internal quotations omitted). In *Kennedy*, the court denied suppression of evidence obtained through a warrantless search of a suitcase, finding that an airline attendant would inevitably have opened it pursuant to airline policy. *Id*. at 500–01.

The government contends that, had Campbell not opened the door, he instead would have asked Alvarado to roll down the window so that he could talk with her. From the rear passenger window, Campbell would have had a direct line of sight to the bottle, which was in the passenger seat's rear webbed pouch. There is no reason to doubt that Campbell would have seen

the bottle through the open window, as he did through the open door. Nor is there reason to doubt that, upon request, Alvarado would have handed Campbell the bottle through the window, as she did through the open door. The court thus finds that, had Campbell never opened the door, he inevitably would have seen the bottle, gained possession of it, read its label, and discovered that it was a prescription belonging to someone other than the occupants of the car. The evidence found in Campbell's subsequent search is therefore not tainted by his opening of the door.

    III.    *Reasonable delay of the traffic stop to investigate other criminal activity*

Aranda claims that Campbell unconstitutionally delayed the traffic stop before developing probable cause to search the vehicle. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates" the Fourth Amendment. *Rodriguez v. U.S.*, 135 S. Ct. 1609, 1612 (2015). "A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id*. (internal citation and quotation marks omitted). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 1615.

Some thirty minutes passed between the time Aranda was pulled over until the time Campbell began his search of Aranda's vehicle. *Cf. United States v. Collazo*, 818 F.3d 247, 257 (6th Cir.) *cert. denied*, 137 S. Ct. 169 (2016) (traffic stop lasting 21 minutes before development of probable cause to search vehicle not an unconstitutional delay). During that time, Campbell spoke with both Nashville dispatch—to obtain backup—and BLOC. BLOC is an intelligence support center serving federal, state, and local law enforcement officers engaged in highway

7

interdiction operations. Campbell made several standard information requests to BLOC, such as checking Aranda's license and registration and determining whether he had outstanding warrants. But he also asked when Aranda had last crossed the Mexican border. Approximately ten minutes later, BLOC called back and informed Campbell that Aranda had crossed the Mexican border a day or two before. Aranda argues that, because Campbell could have obtained the license, registration, and warrant information from Nashville dispatch, the call to BLOC constituted an investigative detour that prolonged the stop unreasonably.

The Sixth Circuit has held that a minimal delay for unrelated investigation does not render a traffic stop unconstitutional. *See United States v. Everett*, 601 F.3d 484 (6th Cir. 2010). In *Everett*, an officer prolonged a traffic stop by several seconds to ask a motorist if he had anything illegal in his possession, such as weapons or narcotics, an inquiry unrelated to the violation giving rise to the stop. *Id*. at 487. The court found that the question was a *de minimus* prolongation because it extended the stop only a few seconds. *Id*. at 495 ("It cannot be said that this single question, in the situation [the officer] confronted, constituted a *definitive* abandonment of the prosecution of the traffic stop in favor of a *sustained* investigation into drug or firearm offenses. Nor did this single question, taking up several seconds, constitute the bulk of the interaction") (emphasis in original).

This case is analogous. Campbell was within the law to run Aranda's license, registration, and warrant information. *See Rodriguez*, 135 S. Ct. at 1615 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.") (internal citations and quotation marks omitted). Nothing in the record

suggests that Campbell's additional inquiry of BLOC about Aranda's border crossing added more than a minute or two to that process. While the *Everett* court deliberately did not set a bright line for how much of a delay is unreasonable, it noted a sister circuit's decision that a "'delay of approximately two minutes . . . did not measurably extend the duration of the stop.'" *Everett*, 601 F.3d at 493 (quoting *United States v. Deverger*, 337 F. App'x. 34, 36 (2nd Cir. 2009)). Had Campbell gotten the license, registration, and warrant information from Nashville dispatch and then called BLOC solely to investigate Aranda's last border crossing, a ten-minute prolonging might have been unreasonable. *See id*. ("Our sister circuits have also found significantly longer delays unlawful. *See, e.g., United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008) (holding that the Fourth Amendment was violated where, three minutes into a traffic stop, the officer told the driver he would receive a warning ticket, but then spent 13 minutes questioning him primarily about drugs, absent any reasonable suspicion, without issuing a ticket)."). But by only adding a few minutes at most to his otherwise-appropriate conversation with BLOC, Campbell did not run afoul of constitutional limits on delay.[3]

Nor did other aspects of the stop render it unconstitutional. Trooper Campbell had a brief discussion with Alvarado and Aranda about not opening the door again or making similar sudden movements, because such actions made Trooper Campbell nervous for his safety. He spoke with Aranda about whether or not Aranda was tired—a possible explanation for why he crossed the fog line—including discussion of the physical symptoms indicating that Aranda was tired. He asked Alvarado and Aranda about their travel plans. None of these actions constituted an

---

[3] Although the defense hints at an assertion that Campbell could have gotten from Nashville dispatch all of the information he needed in connection with a routine traffic stop, there is no proof in this record that the information would have been furnished more quickly than he got it from BLOC.

9

unreasonable delay. "[Q]uestions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer are the sorts of classic context-framing questions directed at the driver's conduct at the time of the stop that rarely offend our Fourth Amendment jurisprudence." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) (internal quotation marks omitted). Neither did removing Aranda from the vehicle to discuss the traffic infraction with him, *see Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977), asking Alvarado for her identifying information, *see United States v. Bah*, 794 F.3d 617, 627 (6th Cir. 2015) (finding officer had lawful reason to request passenger's identification, where passenger was "fumbling around the passenger's side compartment" in a manner that suggested he could be hiding something), nor questioning Aranda about whether he had illegal drugs in the car while BLOC was running Aranda's information, *see Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). Because the actions Trooper Campbell took before developing probable cause to search Aranda's car were constitutionally permissible, the stop did not violate Aranda's right against unreasonable delay.

IV.    *Probable cause for the search*

The government posits that the pill bottle gave Campbell probable cause to search Aranda's vehicle. Specifically, the government argues that Campbell had probable cause based on an apparent violation of Tennessee's legend-drug statute, Tenn. Code Ann. § 53-10-105(a) because the occupants of the vehicle were in possession of a controlled substance not prescribed for them. The defense argues that there was no probable cause based on the bottle alone for the following reasons: 1) The prescription expired in 2012. It is reasonable to assume that people

10

regularly repurpose pill bottles—particularly old bottles from long-expired prescriptions—for all sorts of innocuous purposes. 2) While Campbell could tell that something was in the bottle, because he did not open the bottle, he did not know whether it was Tramadol, some other non-prescription pills, or some similarly shaped objects, such as candy. 3) While he may have had probable cause to search *the bottle* to determine whether Aranda and/or Alvarez were in violation of the law, he did not do so. The bottle alone, thus, did not give him probable cause to search the car.

But the inquiry does not end there. "'[A]n officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity.' 'Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *See United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) *cert. denied*, 137 S. Ct. 169 (2016) (internal citations omitted). "The court's determination of whether probable cause existed at the time of the search is a commonsense, practical question to be judged from the totality-of-the-circumstances. In determining whether there was probable cause, the court does not look to events that occurred after the search or to the subjective intent of the officers; rather, the court looks at the objective facts known to the officers at the time of the search."[4] *United States v. Smith*, 510 F.3d 641, 648 (6th Cir. 2007) (internal citations and quotation marks omitted).

---

[4] Aranda makes much of Campbell's admission that he did not know at the time of the search that Tramadol was a Schedule IV controlled drug. Because Campbell's subjective knowledge is irrelevant to the objective inquiry of probable cause, the court must proceed as if Campbell had known that Tramadol fell within the legend-drug statute's purview. *See Devenpeck v. Alford*, 543 U.S. 146, 154 (2004) ("An arrest made by a knowledgeable, veteran officer would be valid, whereas an arrest made by a rookie in precisely the same circumstances would not. We see no reason to ascribe to the Fourth Amendment such arbitrarily variable protection.") (emphasis in original).

There was a fair probability that contraband would be found in the car based on the following facts known to Campbell by the time of the search: 1) Alvarado opened and quickly shut the door—which could reasonably be construed as suggestive of a potential attempt to dump evidence; 2) Alvarado and/or Aranda were in possession of a pill bottle, bearing a prescription for a controlled substance made out to an absent third party; 3) Aranda and Alvarado gave conflicting stories about where they were going and the purchase of the car they were driving; 4) both appeared nervous, exhibiting signs including shaky hands, throbbing veins, and stiff posture; 5) Aranda had crossed the Mexican border a day or two before the stop, but he told Campbell that he last crossed the border some three months earlier.

In this broader context, Campbell had reason to believe that there was a fair probability that Aranda's vehicle contained evidence that he and Alvarado were at least in violation of § 53-10-105(a), the legend-drug statute. By quickly opening and shutting the door, Alvarado raised the possibility that she was discarding evidence. The expired pill bottle suggested potentially illegal possession of prescription drugs, a suggestion bolstered by Alvarado's potential discard attempt. Aranda and Alvarado's nervous demeanors, conflicting stories, and lies about Aranda's border crossing the previous day further indicated that they had something to hide. It would have been objectively reasonable for Campbell, given the totality of the circumstances, to conclude that Alvarado may have removed illicit pills from the bottle and hidden them in the vehicle before Campbell approached or that Aranda and Alvarado were engaged in the ferrying of unlawful prescription medications in addition to any that might have been disposed of. *See Collazo*, 818 F.3d at 257 (finding that, even if presence of illegally-possessed prescription medication was alone insufficient to establish probable cause to search a vehicle, the totality of

the circumstances justified search, based on the occupants' evasive behavior, conflicting stories, and nervous demeanors). Campbell thus had probable cause to search the vehicle.

V. *The moving of Aranda's vehicle to the gas station*

Finally, Aranda contends that the officers moving his car to the gas station unlawfully intensified the search and constituted a seizure without probable cause. Precedent forecloses these arguments. *See Texas v. White*, 423 U.S. 67, 96 (1975) (finding probable cause to search a car extended to station house, where officer drove car following traffic stop); *Carter v. Hamaoui*, 669 F. App'x. 519 (6th Cir. 2017) ("But once the police had probable cause to search the truck, they also had probable cause to move the truck to a location where they could properly and safely search through it."). Because Campbell had probable cause to search Aranda's car on the roadside, he had probable cause to move the car to the gas station, place it on a lift, and search its undercarriage for secret compartments. Moving Aranda's car was constitutionally permissible.

## CONCLUSION

For the foregoing reasons, Aranda's Motion to Suppress is hereby **DENIED**.

It is so **ORDERED**.

ENTER this 12th day of February 2018.

_____
ALETA A. TRAUGER
U.S. DISTRICT JUDGE